UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEVEN LOUROS,

        Plaintiff,

        -against-                            03 Civ. 1514 (LAK)

LEONARD KREICAS,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Bruce A. Schoenberg
        SCHRADER & SCHOENBERG, LLP
        *Attorneys for Plaintiff*

        Neal Brickman
        Nicole Van Gendt
        LAW OFFICES OF NEAL BRICKMAN
        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge*.

        This is a cautionary tale about do-it-yourself investing. Leonard Kreicas and his attorney, Steven Louros, were amateur investors. Louros gave Kreicas authority to trade options in brokerage accounts containing what Louros says were his life's savings and promised Kreicas a share of the profits. In July 2002, Louros realized losses of hundreds of thousands of dollars. Louros then sued Kreicas for securities fraud, common law fraud, breach of fiduciary duty, breach of contract, and negligence. Kreicas moves for summary judgment dismissing the complaint and for sanctions.

*Facts*

*A.    The Parties*

Louros is a 55-year-old attorney.[1] His solo practice consists of approximately 75 percent plaintiffs' personal injury work, 15 percent real estate transactional work, and 10 percent "miscellaneous breach of contract and debt collection work."[2] Since 1988, he has brought, on behalf of clients, two cases alleging fraud in connection with the sale of securities, but in neither case asserted claims under Rule 10b-5 or Section 10(b) of the 1934 Act.[3] In addition to his law degree, he holds a masters degree in business administration and a bachelor's degree in economics, both from New York University.[4] He has invested in the stock market since the early 1990s.[5]

Kreicas, born in 1945,[6] is a retired industrial chemist[7] with a lively amateur interest in investing,[8] which could help explain why he repeatedly misrepresented the extent of his and his wife's investing experience on applications to open brokerage accounts.[9] Louros met Kreicas in 1992

---

[1]    *E.g.*, Schoenberg Decl. Ex. 23.

[2]    Schoenberg Decl. Ex. 5 ("Louros Decl.") ¶ 3; Louros Dep. 27-28.

[3]    Louros Dep. 29-30, 33-34; Louros Decl. ¶ 2.

[4]    Louros Dep. 12-14.

[5]    *Id*. at 29, 46, 66-68, 126-27.

[6]    *E.g.*, Schoenberg Decl. Ex. 10.

[7]    Kreicas (Vol. I) Dep. 11-12.

[8]    *See generally* Kreicas (Vol. I) Dep.; Kreicas (Vol. II) Dep.

or 1993 through Louros' sister, who worked for a real estate company owned by Kreicas and his wife, Kathy.[10] Louros subsequently represented Kreicas and his wife in connection with a number of legal matters[11] – Kreicas described him as "our family lawyer"[12] – and Louros' sister gave Kreicas a power of attorney over her brokerage account, which he used to trade options in exchange for a fee from her.[13]

B.      *The First Arrangement*

In late 2000 or early 2001, Louros entered into an arrangement with Kreicas under which Kreicas would make trades in Louros' stock accounts in exchange for 10 percent of the profits (the "First Arrangement").[14] The parties dispute the circumstances in which Louros agreed to this arrangement.

The plaintiff alleges that on a number of occasions in 2000, including meetings with Kreicas on October 4 and December 21, Kreicas and his wife urged Louros to allow Kreicas to manage his money. In the plaintiff's telling, Kreicas and his wife told Louros that Kreicas was a

---

[9]

*See, e.g.*, Kreicas (Vol. I) Dep. 93, 133, 135-36, 176-77; Schoenberg Decl. Exs. 10, 11, 18; Pl. 56.1 Counterst. ¶¶ 7-16; Def. Response to Pl. 56.1 Counterst. ¶¶ 7-16.

[10]

Louros Dep. 36, 41.

[11]

*Id*. at 36-40.

[12]

Kreicas (Vol. II) Dep. 46.

[13]

*Id*. at 35, 45.

[14]

Louros Dep. 111-15.

"licensed investment advisor" and that he was "going into" managing other people's money "in a big way."[15] Louros testified that Kreicas led him to believe that he had completed a course and taken a test to receive a license from the State of New York to give investment advice to clients.[16]

At the October 4 and December 21 meetings, according to the plaintiff, Kreicas "assured [Louros] that [Kreicas] utilized a 'very conservative strategy' of using offsetting puts and calls, and that [Louros'] principal would be 'fully protected.'"[17] The plaintiff maintains that he told Kreicas that he was a conservative investor, was not interested in speculating, and could not afford to lose money in the stock market.[18] According to the plaintiff, he entered into the First Arrangement on the basis of these reassurances.[19]

Kreicas disputes that he made these representations.[20] His version is that it was Louros who expressed an interest to Kathy Kreicas in having Kreicas manage his money.[21] In Kreicas' telling, he was open with Louros about the potential risks and returns from trading options:

"I did tell him that he should . . . buy a house and put his money in bonds. And his

---

[15]

Louros Decl. ¶¶ 16, 19, 21, 22.

[16]

Louros Dep. 240.

[17]

Louros Decl. ¶ 20 (October 4 meeting); *id*. ¶ 22 (substantially identical comments at December 21 meeting).

[18]

*Id*. ¶¶ 20, 22.

[19]

*Id*. ¶ 23.

[20]

*See* Def. Response to Pl. 56.1 Counterst. ¶¶ 3-4, 18.

[21]

*See* Kathy Kreicas Dep. 83.

response was that he was not happy with the rate of returns from the bonds, and he wanted something with a higher rate of return . . . . And so I said that generally, I try to get one to one-and-a-half percent a month, but there were no guarantees . . . ."[22]

Kathy Kreicas testified that she never suggested to any friends that they allow her husband to manage their accounts and that she never said to anyone that he was a licensed investment advisor.[23] She did, however, acknowledge having said that her husband "dealt in options,"[24] and Kreicas acknowledged telling Louros that he was interested in starting a hedge fund and managing money for other people.[25]

After the First Arrangement was in place, Louros opened a series of accounts. Although Louros seeks to hold Kreicas liable only for losses resulting from certain trades conducted in 2002 in an account with Charles Schwab & Co. ("Schwab"), the earlier events place the later ones in context.

In September 2000, Louros established a traditional individual retirement account ("IRA") with PaineWebber Incorporated (the "PaineWebber IRA").[26] He indicated on the account application that his "return objective" was "capital appreciation" (the other choices were "current income" and "current income and capital appreciation") and that his risk profile was "moderate" (the

---

[22] Kreicas (Vol. II) Dep. 76.

[23] Kathy Krecias Dep. 77, 80-81.

[24] *Id*. at 87.

[25] Kreicas (Vol. II) Dep. 56-57.

[26] Schoenberg Decl. Ex. 25.

other choices being "conservative" and "aggressive/speculative").[27] Initially, all of the approximately $230,000 in the account was invested in the "PW Retirement Money Fund," but in December 2000, Louros took approximately $75,000 out of that fund and invested it in a Nasdaq index fund.[28]

Around January 2001, Louros, following Kreicas' advice,[29] filled out forms to gain the ability to trade options in the PaineWebber IRA[30] and to give Kreicas a power of attorney and limited trading authority. Louros continued to indicate that his investment objective was capital appreciation and that his risk profile was "moderate."[31] By signing, Louros agreed that he had "received, read and underst[oo]d the Characteristics and Risks of Standardized Options booklet."[32] He indicated that his options activity would be limited to selling covered options[33] only, and that is

---

[27]

     *Id.*

[28]

     *Id.*; Louros Dep. 200-01.

[29]

     *See* Louros Decl. ¶ 24; Kreicas (Vol. II) Dep. 93.

[30]

     It is not clear whether Louros previously had traded options, or had the authority to trade options, in this account. The plaintiff states that "he had not previously" traded options, Pl. 56.1 Counterst. ¶ 20, but on the application, the box marked "updated form" is checked, and the adjacent box marked "new option account" is blank. Schoenberg Decl. Ex. 25.

[31]

     *Id.*

[32]

     *Id.*

[33]

     A covered option is a call option sold by an investor who owns the underlying stock. Writing, or selling, a covered option is less risky than writing an uncovered option, because the investor already owns the asset that he may be called upon to sell. *See* DAVID L. SCOTT, WALL STREET WORDS 88 (2d ed. 1997) ("WALL STREET WORDS").

the only type of option transaction for which he received approval.[34] The account statements reflect that several thousand dollars worth of call options on Johnson & Johnson stock (one of Kreicas' favorites[35]) were sold from the account on February 2 and covered by the purchase of $95,000 worth of Johnson & Johnson stock.[36]

Around this time, Louros, again acting on Kreicas' advice,[37] began transferring the assets in the PaineWebber IRA into a new IRA with Fidelity Brokerage Services LLC (the "Fidelity IRA").[38] On the application for the new IRA, Louros indicated that his investment objective was "growth" (the other choices were "preservation of capital," "income," "aggressive income," and "speculation"). Once again, Louros signed forms to gain the ability to trade options and to give Kreicas the authority to trade in his account.[39] The section on "Investment Information and Experience" – which Kreicas, not Louros, filled out[40] – indicated that Louros' investment objective was "speculation" ("income," the only other choice, was not checked) and that Louros had extensive

---

[34]    Schoenberg Decl. Ex. 25.

[35]    Kreicas (Vol. I) Dep. 32.

[36]    Schoenberg Decl. Ex. 25.

[37]    Louros Dep. 115; Louros Decl. ¶ 25; Kreicas (Vol. II) Dep. 99.

[38]    Schoenberg Decl. Exs. 25, 26; Louros Decl. ¶ 25.

[39]    Schoenberg Decl. Ex. 26.

[40]    *See* Kreicas (Vol. II) Dep. 100.

experience trading equity options.[41]

Six weeks later, Louros, once again prompted by Kreicas, closed the Fidelity IRA, transferred the assets into an IRA account (the "SSB IRA") at Salomon Smith Barney Inc. ("SSB"),[42] and again gave Kreicas authority to trade in that account.[43] This time Louros indicated that his risk tolerance was "aggressive" (the other choices were "moderate" and "conservative"), that his primary and secondary investment objectives were growth and current income, respectively, that his investment objectives did not allow for speculation, that he had not previously traded equity options, that he was aware of the risks of equity options, and that his anticipated activity was selling covered calls.[44] His signature indicated receipt of the pamphlet *Characteristics and Risks of Standardized Options*.[45]

The parties dispute what Louros wrote on the form in which he granted Kreicas discretionary authority over the SSB IRA. A version of the form produced from Louros' files and not completed by Kreicas indicated "conservative" risk tolerance and that his investment objectives

---

[41]

Schoenberg Decl. Ex. 26.

Specifically, the form indicated that Louros had twenty years of experience trading stocks, ten years of experience trading equity options, that he previously engaged in five options trades per month, that he intended to engage in "covered call writing of equity options" and "purchases of calls/puts (equity and index), and purchases of straddles/combinations," and that he had "extensive" experience in both types of trading. *Id.*

[42]

Louros Decl. ¶ 26; Kreicas (Vol. II) Dep. 104; Schoenberg Decl. Ex. 27.

[43]

Schoenberg Decl. Ex. 28.

[44]

Schoenberg Decl. Ex. 27.

[45]

*Id.*

did not allow for speculation, but granted discretion for "securities," "sales of covered calls," "sales of straddles, puts and uncovered calls," and "debt options."[46] The version produced by SSB, however, indicated "aggressive" risk tolerance and that investment objectives did allow for speculation, but granted discretion only for "securities" and "sales of covered calls." SSB's version appears to have been whited out in the areas marked on Louros' version.[47] It is not clear whether these changes were made by Louros or with his consent or, instead, by Kreicas without Louros' knowledge.

In any event, Kreicas conducted options trades in the SSB IRA until September 2001, when Louros withdrew Kreicas' authorization because the stock market was declining and Louros was concerned about investing in equities.[48] At least partly at the suggestion of an SSB broker, the assets in the SSB IRA subsequently were invested in low-risk funds.[49] Nevertheless, around this time Louros invested on his own in options. The January statement for another Louros SSB account (the "SSB Taxable Account") reflects eleven option trades from October to December 31, 2001.[50] Louros testified that he did not understand what he was buying but simply repeated to his broker instructions from a newsletter that included investment recommendations along with verbatim instructions for

---

[46]
      Schoenberg Decl. Ex. 28.

[47]
      *See* Schoenberg Decl. Ex. 29.

[48]
      Louros Dep. 141-43; Louros Decl. ¶ 29.

[49]
      Symansky Dep. 94-95.

[50]
      Schoenberg Decl. Ex. 36.

brokers.[51]

C.      *The Second Arrangement*

        In January 2002, Louros decided to invest larger sums in the stock market.[52] He filled

out forms with a view toward opening professionally-managed accounts with Smith Barney Asset

Management ("Smith Barney Managed Accounts").[53] On the questionnaires regarding investment

objectives, Louros checked the boxes for "Current income is not important" and a "moderate" level

of risk (this box was in between "most conservative" and "conservative," on the one hand, and "S&P

500," "aggressive," and "more aggressive" on the other). He checked as well "growth of capital" on

the form for a taxable account, and "a combination of modest growth of capital and income via high-

quality investments" on the form for an IRA.[54]

        The parties dispute whether it was Louros or the Kreicases who suggested that Louros

once again allow Kreicas to trade for him. According to Louros, in October and December of 2001,

Kathy Kreicas told Louros that Kreicas believed that the market had reached its low point and that

Louros had overreacted to the events of September 11, 2001, informed Louros that Kreicas was

making money for her in her account, and urged Louros to reinvest in the stock market and to allow

---

[51]

        Louros Dep. 47-49, 70-72, 166-67, 188-94.

[52]

        Louros Decl. ¶ 33.

[53]

        Schoenberg Decl. Exs. 30, 31.

[54]

        Schoenberg Decl. Exs. 30, 31.

Kreicas once again to trade in the SSB IRA.[55]

The plaintiff further contends that in a telephone conversation on January 14, 2002, Kreicas dissuaded Louros from opening Smith Barney Managed Accounts by telling him that he "could still lose money" with such an account if the market declined, whereas:

> "because [Kreicas] intended to utilize a 'conservative strategy' of using offsetting put and call options on the S&P 500 Index, my principal would be protected, even if the market experienced a decline. Kreicas told me that he believed that he could earn ½% to 1% profit per month using this strategy."[56]

In any case, Kreicas does not dispute that Louros discussed with Kreicas his plans to open Smith Barney Managed Accounts and at some point provided him with the account-opening forms.[57]

Kreicas' version is that Louros made several telephone calls in which he begged that Kreicas handle his account again.[58] Kreicas testified that he agreed to trade for Louros again "just to get him off my back. That was really just to stop his calls. . . . That was the only reason. I got tired . . . of him calling us."[59]

In any case, there is no genuine dispute that the two spoke by telephone on January 14, 2002 and agreed that Kreicas would trade options using Louros' assets, that Louros would leave assets with Kreicas for approximately one year, that the account statements would be sent only to

---

[55] Louros Decl. ¶¶ 31-32.

[56] *Id.* ¶ 36.

[57] *See id.* ¶ 35; Pl. 56.1 Counterst. ¶ 39; Def. Response to Pl. 56.1 Counterst. ¶ 39.

[58] *See* Kathy Kreicas Dep. 88-89; Kreicas (Vol. II) Dep. 123-34, 142.

[59] Kreicas (Vol. II) Dep. 127.

Kreicas, and that Kreicas would receive 10 percent of the profits he made for Louros (the "Second Arrangement").[60] Louros further maintains that Kreicas told him that his "principal would be safe"[61] and that he entered into the Second Arrangement in reliance on Kreicas' representations during the January 14 telephone call.[62]

Kreicas has told a different story about the representations he made to Louros. He testified that he told Louros that "over ten or twenty years, he could be expected not to lose capital"[63] but that his trading strategies were not risk-free. Kreicas testified that Louros refused to listen:

> "Q.    Did you have any discussions with Mr. Louros about the type of trading you intended to do in his taxable account?
>
> "A.    . . . [H]e refused to listen to me. And I tried to tell him that it is a multi-year plan, you know, ten years at least, and that it is a best-efforts basis; there are no guarantees of the accounts [making] money. I was very specific to warn him that any account can lose money. . . . I specifically said to him, if he wanted to sleep at night and not to worry, to put the money in bonds or T-bills . . . . He refused to diversify. He said, 'I don't know why; it is beyond me.' But I discussed, you know, there were risks, that he could sleep at night much better, and he should concentrate on his law business instead of worrying about stocks. . . . [W]hen I tried to get into detail as to how risky it was . . . he refused to give me the time. He said he was too busy. . . .
>
> "Q.    [Did] you discuss with Mr. Louros the specific trading strategies that you were going to do with his account?

---

[60]

Louros Dep. 152-54; Def. 56.1 St. ¶ 25; Pl. 56.1 Counterst. ¶ 42; Def. Response to Pl. 56.1 Counterst. ¶ 42; *see also* Schoenberg Decl. Ex. 32.

[61]

Louros Dep. 152; *accord id.* at 154-57, 159-61.

[62]

Louros Decl. ¶ 37.

[63]

Kreicas (Vol. II) Dep. 153.

"A.     I wanted to, but he did not."[64]

Regardless of what was said, Louros entrusted to Kreicas the assets in both the SSB IRA, which in late January contained approximately $275,000,[65] and the SSB Taxable Account, which contained approximately $760,000 on January 27, 2002.[66] He contends that he told Kreicas that these funds "represented [his] life savings, and that [he] could not afford to lose any of the principal."[67]

On January 29, 2002, Louros, acting on Kreicas' advice, transferred all of the assets in the SSB IRA and the SSB Taxable Account into a new IRA (the "Schwab IRA") and a new taxable account (the "Schwab Taxable Account"), both with Schwab (collectively, the "Schwab Accounts").[68] Louros represented on the application for the Schwab Taxable Account that his "Investment Knowledge" and "Investment Experience" were "good" (as opposed to "limited," "extensive," or "none") and that his "Overall Investment Objective" was "growth" (rather than "capital preservation," "income," or "speculation").[69] Louros gave Kreicas a power of attorney over

---

[64]     *Id.* at 137-39.

[65]     *See* Louros Dep. 186; Brickman Aff. Ex. B-7.

[66]     Schoenberg Decl. Ex. 36.

[67]     Louros Decl. ¶ 38.

[68]     *Id.* ¶ 39; Brickman Aff. Ex. B-7.

[69]     Brickman Aff. Ex. B-7.

his accounts,[70] and both men signed applications for option trading authority for both accounts.[71] On the application to trade in the Schwab IRA, the box was checked for an investment strategy of "covered options," the objective of which the form identified as "conservation of capital, income, investment hedge."[72] But on the application to trade in the Schwab Taxable Account, the box was checked for "uncovered option writing," the objective of which the form identified as "speculation, income."[73] Furthermore, Louros represented on both applications for option-trading authority that he had ten years of option-trading experience, that he engaged in ten option trades per year, that the "Size of Transactions" was $50,000, and that his "Knowledge Level" regarding options was "good" (the other choices were "limited," "extensive," and "none").[74] The application included a form representation, which provided in pertinent part:

> "I represent that I am aware of the inherent risks of option trading and that I am financially able to bear such risks and withstand option trading losses. . . . I understand that the booklet *Characteristics and Risks of Standardized Options* will be sent to me when my account is approved for option trading. I agree to read the booklet prior to conducting any trades in my account."[75]

Kreicas says that his trading strategy should have produced modest gains most of the

---

[70] *Id.*; Louros Dep. 186.

[71] Schoenberg Decl. Exs. 23, 24.

[72] Schoenberg Decl. Ex. 23.

[73] Schoenberg Decl. Ex. 24.

[74] Schoenberg Decl. Exs. 23, 24.

[75] Schoenberg Decl. Exs. 23, 24.

time in exchange for a low probability of a major loss.[76] He had no discussions with Louros about the latter's investment history or assets.[77] Kreicas testified that he tried to discuss with Louros the specific transactions he would conduct and their risks, but Louros said: "Do whatever you want to do."[78]

What Kreicas wanted to do, and did in the Schwab Taxable Account,[79] was to use combinations, which are option-trading strategies in which an investor takes two or more option positions in the same underlying security. Here is what the booklet *Characteristics and Risks of Standardized Options* says about combinations:

> "Transactions that involve buying and writing multiple options in combination . . . present additional risks to investors. Combination transactions, such as option spreads, are more complex than buying or writing a single option. And it should be further noted that, as in any area of investing, a complexity not well understood is, in itself, a risk factor. . . . [I]t is advisable, as is the case with all investments in options, to consult with someone who is experienced and knowledgeable with respect to the risks and potential rewards of combination transactions under various market circumstances."[80]

At first, Kreicas' trades resulted in modest gains and losses in the Schwab IRA and somewhat larger fluctuations in the Schwab Taxable Account, including losses of as much as

---

[76]

See Kreicas (Vol. II) Dep. 211-12.

[77]

*Id.* at 140-41.

[78]

*Id.* at 167-68.

[79]

The Schwab IRA did not permit the same range of trades as the Schwab Taxable Account.

[80]

AMERICAN STOCK EXCHANGE ET AL., CHARACTERISTICS AND RISKS OF STANDARDIZED OPTIONS 67 (1994).

$19,000 one month and gains of as much as $20,000 another month.[81] In general, Louros did not complain about the losses or about Kreicas' trading strategy.[82] In fact, in May 2002, Kreicas requested that Louros increase his percentage of profits from 10 percent to 20 percent, and Louros agreed.[83] Louros testified that he received confirmations of orders and monthly account statements but that he did not understand Kreicas' transactions.[84]

D.      *The Disputed Transactions*

The trouble began in June. In May and June, Kreicas created a number of vertical bull spreads using put options in the Schwab Taxable Account.[85] This strategy consists of the simultaneous (1) sale of put options at a strike price below the current market price, and (2) purchase of put options that are identical except that they have an even lower strike price.[86] An investor who uses a vertical bull spread with put options is betting that the price of the underlying asset – in this case, securities based on the Standard & Poor's 500 Index (the "S&P 500") – will not dip below the higher strike price before the options expire. The options with the lower strike price cap the investor's potential losses.

---

[81]     Louros Dep. 196-99, 202, 205, 209.

[82]     *Id*. at 197-201, 209.

[83]     *Id*. at 226-27, 242-43; Louros Decl. ¶¶ 41-42.

[84]     Louros Dep. 230.

[85]     Conner Decl. ¶¶ 8-21.

[86]     *Id*. ¶ 9; WALL STREET WORDS 236, 409.

The placement of such a vertical spread on an account results in an immediate gain (the put options with the higher strike price, which are sold, invariably are worth more than the ones with the lower strike price, which are bought) but creates the risk that the investor can lose up to the entire amount of the spread between the two strike prices, multiplied by the number and size of the option contracts.[87] For example, a vertical spread that Kreicas placed in the account on May 20, 2002 (the "May Spread") resulted in an initial gain of approximately $19,000 but created the risk of a loss of up to $585,000 ($566,000 net). In the event, Louros sustained a charge of over $47,000 when the May Spread was closed out on June 21 for a net loss of approximately $28,600.[88] Louros is not here suing on this loss.

The losses at issue in this case were the result of several bull spreads placed in June 2002. On June 7, 24, 27, and 28, Kreicas placed vertical bull spreads in the account (the "June Spreads") that resulted in initial gains of $45,000 but risked an aggregate loss of up to $750,000.[89] At a real estate closing on June 21, according to Louros, he told Kreicas that he was concerned about protecting his principal because the S&P 500 was declining and asked if he should get out of the market. Kreicas allegedly responded: "Don't worry, you're invested very conservatively" and assured Louros that his use of "offsetting put and call options on the S&P 500 Index" meant that Louros'

---

[87]

See Conner Decl. ¶¶ 9-11.

[88]

See Schoenberg Decl. Ex. 34; see also Conner Decl. ¶¶ 11, 16.

[89]

See Schoenberg Decl. Ex. 34.

On June 21, Kreicas exchanged one-quarter of the contracts purchased in connection with the position created June 7 so as to increase the spread on one-quarter of that position. Conner Decl. ¶¶ 18-19.The Court has factored this transaction into the calculation of total gains and potential losses.

principal would be safe even if the market declined.[90]

The S&P 500 dropped for much of July. Louros telephoned Kreicas numerous times to express concern.[91] By July 19, 2002, the S&P 500 had plummeted to less than the value of the lower strike price on each of the June Spreads.[92] Most of the positions that had been created in connection with the June Spreads then were closed out – it is not entirely clear whether this was a result of a decision by Kreicas, instructions from Louros, or an order from the brokerage house[93] – and Louros realized gross losses in the Schwab Taxable Account of $566,500.[94]

E.    *This Action*

The complaint asserted claims under Section 10(b) of the Securities Exchange Act of 1934[95] and Rule 10b-5[96] promulgated thereunder, the Commodities Exchange Act ("CEA"), the Investment Advisers Act ("IAA"), and various state law theories. Louros withdrew the CEA and IAA claims, and the Court granted leave to amend.[97]

---

[90]    Louros Decl. ¶ 45.

[91]    Kreicas (Vol. II) Dep. 218-19; Louros Decl. ¶ 46.

[92]    Conner Decl. ¶ 21.

[93]    *See* Kreicas (Vol. II) Dep. 196, 217-18; Louros Dep. 211-14.

[94]    *See* Schoenberg Decl. Ex. 34.

[95]    15 U.S.C. § 78j(b).

[96]    17 C.F.R. § 240.10b-5.

[97]    *Louros v. Kreicas*, No. 03 Civ. 1514, 2003 WL 22353979 (S.D.N.Y. Oct. 15, 2003).

The Section 10(b) and Rule 10b-5 claim in the amended complaint (the "Complaint") is one for unsuitability. The plaintiff alleges that Kreicas was aware of Louros' investment objectives, that the options purchased in the Schwab Taxable Account were unsuited to Louros' needs, that Kreicas failed to disclose the risks and unsuitability of his investment strategy to Louros, that Kreicas knowingly made misrepresentations and omissions relating to the suitability of the options he purchased, and that Louros justifiably relied to his detriment upon Kreicas' conduct.[98]

The specific misrepresentations and omissions relating to the suitability of the options allegedly were as follows[99]:

(1)     Kreicas told Louros on certain occasions in 2000 that he was a "licensed investment advisor;"[100]

(2)     Kreicas told Louros on the same occasions (a) that he used a "very conservative" investment strategy and (b) that Louros' principal would be "fully protected;"[101]

(3)     Kreicas told Louros during the telephone conversation on January 14, 2002 that his proposed investment in offsetting put and call options on the S&P

---

[98]

Am. Cpt. ¶¶ 78-87.

[99]

One misrepresentation alleged in the Complaint, namely that a certain margin call from Schwab was a "stupid mistake" that Louros should ignore, *id*. ¶ 84(e), is not set forth here or otherwise considered further in this opinion. The plaintiff does not clearly explain or discuss the significance of this alleged misrepresentation in his papers and thus has abandoned it as a basis for the Section 10(b) claim.

[100]

*Id*. ¶ 84(a), (b).

[101]

*Id*. ¶ 84(a), (b).

500 would be conservative and safer than the Smith Barney Managed Accounts;[102]

(4)    Kreicas told Louros during that telephone conversation[103] that, using his strategy, Louros' principal would be protected even if the market declined;[104]

(5)    Kreicas told Louros at the closing on June 21, 2002 that (a) he was "invested very conservatively" and (b) "because of [Kreicas'] use of offsetting put and call options on the S&P 500 Index, Louros' principal was safe and he was protected even if the market itself declined further,"[105] these representations allegedly being false because Kreicas no longer had call options in place to hedge the bull spreads and because Kreicas had realized a $29,000 loss that same day and therefore knew that the vertical bull spread strategy was not safe;[106]

(6)    Kreicas failed to disclose on June 21, 2002 that:

    (a)    the gains realized in connection with the placement of some of the June Spreads was far outweighed by the risk of loss;

---

[102]

*Id.* ¶ 84(c).

[103]

The time and place of this alleged misrepresentation are not set forth explicitly in the Complaint. The Court infers the setting from context and from the factual record.

[104]

*Id.* ¶ 84(d).

[105]

*Id.* ¶ 84(f).

[106]

*Id.* ¶ 85.

(b)     Louros could suffer losses if the S&P 500 declined by more than
        Kreicas anticipated;

(c)     Louros' risk was multiplied by the large size of his position;

(d)     The protection conferred by ownership of the option with the lower
        strike price was illusory because Louros' potential losses, though
        limited, still were enormous.[107]

These alleged misrepresentations and omissions are referred to in this opinion using the above
enumeration – for example, "Misrepresentation (1)" or "Omission (6)(a)."

The remaining four counts of the Complaint are for (a) common law fraud based on
the same alleged misrepresentations (but not omissions) on which the securities fraud claim is based,
(b) breach of fiduciary duty based on the allegation that Kreicas owed Louros certain duties as an
investment advisor that he failed to fulfill, (c) breach of contract based on the allegation that Kreicas
made speculative and unsuitable investments in violation of the parties' agreement, and (d)
negligence based on the same allegations supporting the claims for common law fraud and breach
of fiduciary duty.[108]

The matter now is before the Court on Kreicas' motion for summary judgment
dismissing the complaint and for sanctions.

---

[107]     *Id.* ¶ 86.

[108]     *Id.* ¶¶ 89-112.

*Discussion*

A.    *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[109] The moving party has the burden of demonstrating the absence of a genuine issue of material fact,[110] and the Court must view the facts in the light most favorable to the nonmoving party.[111] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[112] In that event, the nonmoving party must come forward with admissible evidence[113] sufficient to raise a genuine issue of fact for trial.[114]

B.    *Count One: The Section 10(b) Claim*

To prevail on a claim under Section 10(b) and Rule 10b-5, a private plaintiff

---

[109]

Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).

[110]

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

[111]

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

[112]

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways Plc*, 257 F.3d 256, 273 (2d Cir. 2001).

[113]

*See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001).

[114]

*E.g.*, *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

ordinarily must prove that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[] relied; and (5) that plaintiff['s] reliance was the proximate cause of [his] injury."[115] In this case, however, the Complaint asserts a claim of unsuitability, which is "a subset of the ordinary § 10(b) fraud claim[.]"[116] A plaintiff asserting such a claim must prove:

> "(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct."[117]

An unsuitability claim, then, is similar to an ordinary Section 10(b) fraud claim, except that the unsuitability claim requires (a) proof of the knowing purchase or recommendation of unsuitable securities, and (b) that the misrepresentations and omissions in question relate to the suitability of the securities, rather than that they be in connection with their purchase or sale.

Both parties fail on this motion to distinguish rigorously between a claim for unsuitability and a traditional Section 10(b) claim. The Court therefore considers whether there are genuine issues of fact as to the elements of both types of claims.

---

[115]

*In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998); *accord Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

[116]

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993).

[117]

*Id.*; *see also Nat'l Union Fire Ins. Co. v. Woodhead*, 917 F.2d 752, 757 (2d Cir. 1990); *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 599-601 (2d Cir. 1978).

*1.     The Unsuitability Theory*

a.     Suitability of the investments

The defendant argues that options were a suitable investment for Louros and points out that Louros had engaged in a similar trading strategy in 2001, had traded index options on his own, and had indicated an aggressive risk tolerance and an intention to trade options on his application for the SSB IRA.

At best, this is some evidence for the defense, but it falls far short of establishing the absence of a genuine issue of fact as to suitability. First of all, the investments that resulted in the losses at issue here were not options generally but the June Spreads in particular. Louros himself never used vertical bull spreads when he traded options on his own. Louros represented on the SSB IRA form an intention to trade covered calls only, a safer type of investment than the June Spreads, and he specifically indicated that his investment objectives did not allow for "speculation." Nor is it clear that Kreicas used vertical bull spreads in 2001. Even if he did, that would not necessarily establish their suitability for Louros in 2002.

Furthermore, the account-opening documents for the Schwab Accounts indicated an overall objective of "growth," not "speculation," and the forms for the Smith Barney Managed Accounts reflected a tolerance only for "moderate" risk. Unlike the SSB IRA application, the forms for these accounts were filled out either just prior to or after the creation of the Second Arrangement. Other applications filled out in connection with the First Arrangement also suggest arguably moderate investment goals.

It is true, although the defendant fails to point it out in discussing the suitability element, that Louros had indicated on the application to trade in the Schwab Taxable Account an

intention to trade in "uncovered option writing," the objective of which was identified as "speculation, income." This is further evidence from which a trier of fact might conclude that vertical bull spreads, even if they were aggressive and risky, in fact were suited to Louros' objectives for the assets in the Schwab Taxable Account. On a motion for summary judgment, however, this Court's function is not to weigh the evidence. It is sufficient to recognize that there is evidence from which a trier of fact could conclude that the first element of the unsuitability claim, namely that the June Spreads were unsuited to Louros' needs, has been satisfied.

### b.    Kreicas' knowledge of the unsuitability

Kreicas does not meaningfully discuss the second element of the unsuitability claim except to say that the circumstances discussed above "show that Kreicas had a reasonable belief that options were suitable for the Plaintiff."[118] The relevant issue, however, is Kreicas' knowledge or belief regarding the suitability of the June Spreads, not options generally.

It is undisputed that Kreicas had seen Louros' applications to open the Smith Barney Managed Accounts and the Schwab Accounts, as well as a number of other accounts during the First Arrangement. Furthermore, Louros has offered evidence that he told Kreicas on various occasions that he was a conservative investor and did not want to speculate. There is therefore ample evidence from which a trier of fact could infer that Kreicas reasonably believed that Louros' overall objective was growth, not speculation. Furthermore, it is undisputed that Kreicas knew that he had staked essentially the entirety of the Schwab Taxable Account on the S&P 500 not experiencing a sharp decrease.

---

[118]    Def. Reply Br. 15.

Accordingly, a trier of fact could conclude that Kreicas knew or reasonably believed that the June Spreads were unsuited to Louros' needs. As it undisputed that Kreicas purchased or recommended the securities said to be unsuitable (the third element of the unsuitability claim), the Court proceeds to consider the remaining elements of the unsuitability claim.

        c.        Misrepresentations or omissions relating to the suitability of the securities

Neither party has addressed directly whether the misrepresentations and omissions alleged in the Complaint related to the suitability of the June Spreads.

Misrepresentation (1) dealt only with Kreicas' credentials, which had nothing to do with whether the June Spreads were suitable for Louros' needs.

Misrepresentation (2) is immaterial because it was made prior to the First Arrangement, which was terminated. Furthermore, all of the information in Misrepresentation (2) is contained in Misrepresentations (3) and (5).

Misrepresentations (3) through (5) appear to have related directly to the suitability of the June Spreads. Misrepresentation (3), which is that the proposed investment in "offsetting put and call options" would be conservative and safer than the Smith Barney Managed Accounts, concerned the riskiness of the investments that Kreicas intended to undertake on Louros' behalf. Furthermore, the June Spreads did not consist of "offsetting put and call options." Quite the contrary; they were a series of bull positions that failed to hedge market risk. Similarly, Misrepresentation (4) related to suitability because Louros allegedly wanted to preserve principal to the maximum extent. Misrepresentation (5) contained the same information as Misrepresentations (3) and (4) and furthermore is alleged to have been made at a time when Kreicas already had created some of the

June Spreads, which enhanced both the falsity of the representation and the representation's relationship to the suitability of the June Spreads.

Omissions (6)(a) through (c) likewise dealt with the riskiness of the positions that Kreicas was in the midst of creating and therefore related directly to suitability.[119]

Omission (6)(d), however, is another matter. The allegation of Omission (6)(d), a failure to disclose that the "protection" of the spreads was illusory, presupposes that Louros either understood independently how the vertical bull spread worked or that Kreicas had explained it to him, at least to the extent of the protection mechanism. But Louros' position is that he understood little or nothing about options, let alone the workings of the combination strategies used by Kreicas. Furthermore, there is no evidence that Kreicas explained the vertical bull spread's protection mechanism to Louros. Omission (6)(d) thus cannot be a basis for liability on the present factual record.

Accordingly, the Court will consider the remaining elements of the unsuitability claim – all of which are elements of a garden variety Section 10(b) claim – as they apply to Misrepresentations (3), (4), and (5), and Omissions (6)(a) through (c).

---

[119] The Court assumes for purposes of this motion that Kreicas owed a duty that would make Omissions (6)(a) through (c) actionable. "In the case of an omission, the duty to disclose generally 'arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir. 1998) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)); *accord Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001). Kreicas had been given a power of attorney and discretionary trading authority over Louros' accounts. The defendant does not dispute that there was a fiduciary or comparable relationship of trust and confidence.

2.     *The Ordinary Section 10(b) Fraud Theory: Misrepresentations or Omissions in Connection with the Purchase or Sale of Securities*

The Court next considers whether there is a genuine issue of fact as to each alleged misrepresentation's connection to the purchase or sale of securities.

The Second Circuit recently reviewed the contours of the "in connection with" requirement:

> "Our cases have . . . given an 'expansive[]' construction to the 'in connection with' requirement. The reach of the 'in connection with' phrase, while broad, is of course not unlimited. '[T]he incidental involvement of securities d[oes] not implicate the anti-fraud provisions of the federal securities laws.' The fraud must be 'integral to the purchase and sale of the securities in question.'"[120]

In *Chemical Bank v. Arthur Andersen & Co.*,[121] Judge Friendly observed that "[t]he purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions–to make sure" – among other things – "that buyers of securities get what they think they are getting[.]"[122] Since *Chemical Bank,* district courts have found that when an alleged misrepresentation concerns the "value, nature or investment characteristics of the securities at issue,"[123] it satisfies the "in connection with" requirement.[124]

---

[120]

    *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 (2d Cir. 2005) (citations omitted), *petition for cert. filed* (U.S. Apr. 11, 2005) (No. 04-1371).

[121]

    726 F.2d 930 (2d Cir. 1984).

[122]

    *Id*. at 943.

[123]

    *Prod. Res. Group, L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236, 240 (S.D.N.Y. 1998).

[124]

    *E.g.*, *id.*; *Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96 Civ. 2549 RWS, 1997 WL 97837, at *5 (S.D.N.Y. 1997); *Mfrs. Hanover Trust Co. v. Smith Barney, Harris*

a.      Misrepresentation that Kreicas was a "licensed investment advisor"

Kreicas' alleged representation that he was a "licensed investment advisor" is alleged to have been made only in October and December of 2000 – prior to the First Arrangement, which was terminated – and not in relation to the June Spreads. The question is whether it was integral to those transactions and thus satisfied the "in connection with" requirement.

Louros relies on *Marbury Management, Inc. v. Kohn*,[125] which held that a trainee's misrepresentation that he was a properly licensed stock broker was actionable under Section 10(b). In that case, however, there was sufficient proximity between the alleged misrepresentations and the plaintiff's decision to invest with the trainee's brokerage such that the misrepresentations could be regarded as connected to the investment. Here, there is nothing of the kind. Accordingly, Misrepresentation (1) cannot be a basis for liability.[126]

b.      Misrepresentations and omissions relating to the risks of Kreicas' trades

Misrepresentation (2) was made prior to the First Arrangement and, in any case, was

---

*Upham & Co.*, 770 F. Supp. 176, 181 (S.D.N.Y.1991); *see also Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 01 Civ. 3013 (DLC), 2001 WL 1182927, at *3 (S.D.N.Y. Oct. 9, 2001).

[125]

629 F.2d 705, 710 (2d Cir. 1980).

[126]

The Court would reach this conclusion even if Misrepresentation (1) could be considered to have been in connection with the purchase or sale of the June Spreads because reliance on this representation is not alleged or proved in connection with the Second Arrangement and in any case would not have been justifiable. *See* footnote 143 below. The Court therefore finds it unnecessary to address the plaintiff's alternative argument that Misrepresentation (1) was in connection with the purchase or sale of an investment contract.

repeated in Misrepresentations (3) and (4). It therefore does not come under the *Chemical Bank* policy of ensuring that investors get what they think they are getting. Nor can it be said to be integral to the purchase and sale of the June Spreads.

Misrepresentations (3) through (5) and Omission (6) dealt with the riskiness of the options that Kreicas was proposing to trade, or had traded, for Louros. Kreicas does not dispute this point in his reply brief, and the cases cited in his opening brief are beside the point. They held only that general promises by a broker of conservative stewardship, or puffery regarding the future performance of a brokerage account, are not actionable under Section 10(b).[127] What is alleged here, however, is not simply a general promise that Kreicas would manage Louros' money conservatively or make money for him, but specific statements and omissions regarding the nature and amount of risk associated with the securities that Kreicas purchased and sold in Louros' account.

Accordingly, the Court will consider the remaining elements of the ordinary Section 10(b) fraud theory as they apply to Misrepresentations (3), (4), and (5), and Omissions (6)(a) through (c). Omission (6)(d) is not actionable for the reasons stated above.

---

[127]

*See* Def. Br. 9-12 (citing *Bogart v. Shearson Lehman Bros.*, No. 91 Civ. 1036; 1993 WL 33643, at *5 (S.D.N.Y. Feb. 3, 1993) (M.J.) ("general assurances that plaintiff's account would be handled in his best interests and so as to minimize risk" were insufficient to support Section 10(b) claim); *McCoy v. Goldberg*, 748 F. Supp. 146, 150 (S.D.N.Y. 1990) (financial advisor's assurances "that he would implement a safe and conservative investment program tailored to [the plaintiff's] needs which would provide complete safety of principal and a reasonable rate of return" insufficient to state Section 10(b) claim because they "did not pertain to the value or quality of any specific securities purchased by plaintiff"); *Siegel v. Tucker, Anthony & R.L. Day, Inc.*, 658 F. Supp. 550 (S.D.N.Y. 1987) (similar); *Newman v. L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 163 (S.D.N.Y. 1986) (statements by defendant broker that "I'll make money for you" and that the plaintiffs were going to "make good money on new issues" not actionable)).

3.     *Both Theories:* Scienter

*Scienter* is an element of both unsuitability and ordinary Section 10(b) fraud claims. "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud . . . or at least knowing misconduct[.]"[128] It is an issue of fact[129] that should not be resolved on summary judgment "unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive."[130]

In the context of an unsuitability claim, "[s]cienter may be inferred by finding that the defendant knew or reasonably believed that the securities were unsuited to the investor's needs, misrepresented or failed to disclose the unsuitability of the securities, and proceeded to recommend or purchase the securities anyway."[131] In other words, the satisfaction of certain other elements of the unsuitability claim – namely, that the defendant knew that the securities were unsuitable, purchased or recommended them anyway, and made misrepresentations relating to suitability – allows an inference that the misrepresentations relating to suitability were made with *scienter*.

As discussed above, there is sufficient evidence here of each of those other elements. Accordingly, there is a genuine issue of fact as to *scienter* for purposes of the unsuitability claim.

---

[128]
    *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted); *accord Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[129]
    *E.g.*, *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999); *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).

[130]
    *Wechsler v. Steinberg*, 733 F.2d 1054, 1059 (2d Cir. 1984); *accord RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 403 (S.D.N.Y. 2002).

[131]
    *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993).

In the context of an ordinary Section 10(b) fraud claim, it is well-established that a plaintiff may sufficiently allege *scienter* by "(1) alleg[ing] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) alleg[ing] facts to show that defendants had both motive and opportunity to commit fraud."[132] It therefore follows that to get to the jury on the question of *scienter*, a plaintiff asserting an ordinary Section 10(b) fraud claim must produce evidence supporting either type of allegation.

Louros has satisfied that burden, at least with respect to conscious misbehavior or recklessness.[133] The record indicates that in June 2002, Kreicas staked substantially all of the assets in the Schwab Taxable Account on his belief that the market would not dip precipitously. A jury could find that Kreicas' use of such a strategy, especially after significant losses were realized from the May Spread, constituted conscious misbehavior or at least recklessness.[134] Accordingly, there are genuine issues of fact as to *scienter*.

---

[132]

*Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000); *accord Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 28 (S.D.N.Y. 2004).

[133]

The plaintiff hints that there is evidence of motive and opportunity, *see* Pl. Br. 33 n.10, but does not flesh out the argument.

[134]

The defendant cites *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996), for the proposition that it is not highly unreasonable to assume a low risk of substantial loss in exchange for modest profits. But that decision addressed only whether a prospectus for an investment vehicle was misleading, not the circumstances that constitute recklessness for purposes of the scienter requirement. The court held, over Judge Newman's dissent, that the prospectus was not misleading because it fully set forth the investment strategy and its risks even if it did not spell out an unstated bet that interest rates would rise. *Olkey*, however, did not hold that the investment strategy described in that prospectus would be reasonable in every case, or otherwise bar a trier of fact in this case from finding that the placement of the June Spreads evidences recklessness on Kreicas' part.

4.      *Both Theories: Reliance*

Both Section 10(b) theories require that the plaintiff have relied justifiably on the alleged misrepresentations and omissions. Whether a plaintiff justifiably relied is a mixed question of fact and law. It is well-established that "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."[135] Liability under Section 10(b) "will not be imposed when an investor's conduct rises to the level of recklessness."[136]

Courts frequently consider a number of factors in determining whether a plaintiff's reliance was unjustifiable as a matter of law:

> "(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."[137]

In this case, the relevant misrepresentations can be divided into two groups: representations that (1) Louros' principal would be protected even if the market declined, and (2) the investments in question were conservative.

The first group, which includes Misrepresentations (4) and (5)(b), amounted to an assurance that Louros could make money with no risk. But the relationship between risk and return

---

[135]

Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993); *accord Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998).

[136]

*Brown*, 991 F.2d at 1032.

[137]

*Id.*; *accord Manela v. Garantia Banking Ltd.*, 5 F. Supp. 2d 165, 176-77 (S.D.N.Y. 1998).

is one of the fundamental features of all commercial and financial dealings. The Second Circuit has recognized that the failure to disclose information "so basic that any investor could be expected to know it" is not actionable under the securities laws.[138] That it is impossible to obtain returns in the stock market, using options or otherwise, without assuming some risk falls into this category. As one court has put it, "[t]hat there are risks inherent in stock market investment is, in our view, information so basic that it need not be disclosed by the broker."[139]

Application of this principle is especially appropriate here. Louros was an attorney with degrees in economics and business and approximately ten years of experience as an investor. He repeatedly certified on applications that he understood the risks of option trading, he had received or been sent the standard booklet on the nature and characteristics of options at least three times, and he had even placed some of his own option trades (albeit allegedly without understanding what he was buying). If Louros did invest with Kreicas in reliance on a representation that Kreicas had come up with a way to make money on option trades without incurring any risk, that reliance was not justifiable as a matter of law.

The second group of alleged misrepresentations is another matter. These, which include Misrepresentations (3) and (5)(a), amounted to statements about the risk profile of specific investments Kreicas either planned to make or had made.

Kreicas makes much of the fact that Louros had traded options previously, certified

---

[138]

*Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984); *accord Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir. 1998).

[139]

*Bischoff v. G.K. Scott & Co.*, 687 F. Supp. 746, 751 (E.D.N.Y. 1986); *accord Keenan v. D.H. Blair & Co.*, 838 F. Supp. 82, 87 (S.D.N.Y. 1993).

his understanding of the riskiness of option-trading, and received the booklet designed to disclose the risks of options. He argues that Louros therefore must have known that options and, in particular, combinations entailed certain risks.

Assuming the validity of Kreicas' general point, it is wide of the mark. Some option strategies are riskier than others. A fact-finder could conclude that Louros did not have a sophisticated understanding of the amount of risk entailed by particular types of options or combinations. The standard booklet says little or nothing about vertical bull spreads. In any case, a trier would be entitled to find that Kreicas did not tell Louros that he would be creating vertical bull spreads and selling put options as part of that strategy. The only way in which Louros could have assessed the risk of the June Spreads was to inquire into the specific positions that Kreicas had created in his account and then research their risks. But Louros had placed his trust in Kreicas,[140] and it was Kreicas, not Louros, who had immediate access to all of the relevant information. In all of the circumstances, the Court cannot say as a matter of law that it would have been unjustifiable to rely on representations by Kreicas that Louros would be and was invested conservatively. The issue is properly for the jury.[141]

Finally, reliance is presumed (rebuttably) to be satisfied when the claim rests on the omission of a material fact.[142] Omissions (6)(a) through (c) concern the precise risk characteristics

---

[140] *See* footnote 119 above.

[141] *Cf. Manela v. Garantia Banking Ltd.*, 5 F. Supp. 2d 165, 177 (S.D.N.Y. 1998).

[142] *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir. 1999); *Manela*, 5 F. Supp. 2d at 172-73.

of Louros' position on June 21, 2002. There is no suggestion that these facts were not material.

Accordingly, there is a genuine issue of fact as to whether Louros justifiably relied on Misrepresentations (3) and (5)(a), and Omissions (6)(a) through (c), but no genuine issue with respect to Misrepresentations (4) and (5)(b).[143]

### 5. Both Theories: Loss Causation

A securities fraud plaintiff must prove loss causation, which is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."[144] The requirement applies by statute to any claim brought under Section 10(b) and thus applies to unsuitability claims in addition to ordinary fraud claims.[145]

---

[143]

Even if Misrepresentation (1) were not insufficient on other grounds, *see* section B.1.c. and footnote 126 above, there could be no recovery for it because justifiable reliance was absent. Louros offers no facts to show that he relied on Misrepresentation (1) in entering into the Second (as opposed to the First) Arrangement. Even if the facts could be construed to suggest such reliance, however (the Court does not believe that they can), his reliance would have been unjustifiable as a matter of law. Louros was an attorney who had represented Kreicas for eight years. It would be foolhardy to rely on a representation that Kreicas had received some kind of unspecified license to provide investment advice without conducting the slightest inquiry into the type of license he had received and what it authorized him to do.

[144]

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *accord Dura Pharms., Inc. v. Broudo*, No. 03-932, ___ S. Ct. ___, 2005 WL 885109 (U.S. Apr. 19, 2005); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

[145]

*See* 15 U.S.C. § 78u-4(b)(4).

The Second Circuit's formulation of an unsuitability claim in *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993)*, does not mention loss causation. *Brown*, however, was rendered before the Private Securities Litigation Reform Act codified the causation requirement for Section 10(b) cases. In any case, *Brown* does require that "the buyer justifiably relied to its detriment on the defendant's fraudulent conduct." This element comprehends a requirement of causation, and with it the jurisprudence on loss causation in securities fraud cases.

The Second Circuit recently explained in *Lentell v. Merrill Lynch & Co.* that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."[146] The Circuit then elaborated on this principle by quoting approvingly from an earlier decision:

> "If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss."[147]

Under these principles, there are genuine issues of fact as to loss causation. A reasonable jury could find that the June Spreads created the risk that Louros could lose nearly all of the money in the Schwab Taxable Account if the market dipped. It could determine further that Misrepresentations (3) and (5)(a) and Omissions (6)(a) through (c) concealed this risk and that it was precisely this risk that materialized and that culminated in the closing out of some of the June Spreads on July 19 for a loss of over $500,000.

The preceding analysis applies to the ordinary Section 10(b) fraud theory, but almost the same analysis applies to the unsuitability theory. The essence of an unsuitability claim is that the defendant purchased or recommended unsuitable securities while concealing information relating to their suitability. Loss causation as delineated in *Lentell* is satisfied if the risk or other attributes that rendered the investments unsuitable in the first place materialized to the plaintiff's detriment.

---

[146]

*Lentell*, 396 F.3d at 173.

[147]

*Id.* (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188 (2d Cir. 2001)).

As discussed earlier, Misrepresentations (3)and (5)(a) and Omissions (6)(a) through (c) related to suitability. And, as just discussed, a reasonable jury could find that the risks they concealed were precisely the risks that materialized.

Kreicas attempts to draw support from the principle that "when the plaintiff's loss coincides with a marketwide phenomenon causing *comparable losses to other investors*, the prospect that the plaintiff's loss was caused by the fraud decreases."[148] He points out that news of certain securities scandals surfaced in the summer of 2002, causing what he calls "a precipitous and unforeseeable decline"[149] in the stock market.

The argument does not avail because Louros' losses were not comparable to those of other investors. On the contrary, the size and number of outstanding option contracts written from Louros' account meant that a drop in the S&P 500 below a certain level would produce losses magnified out of proportion to the decrease. No one can predict the behavior of the stock market, and it was entirely foreseeable that Louros would lose all of his money if the S&P 500 declined sufficiently. Indeed, this was precisely the risk concealed by the misrepresentations and omissions at issue, or so a fact-finder could conclude. Thus, Kreicas at most has raised an argument that Louros' damages, if any, should be reduced by the amount that a similarly situated plaintiff who had not been defrauded would have lost as a result of the market decline during the relevant time period.

---

[148]

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (emphasis added); *accord Lentell*, 396 F.3d at 174.

[149]

Def. Br. 23.

*6.      Mitigation and Ratification*

Kreicas argues that Louros should not recover because he failed to mitigate his losses. Louros expressed concern about his investments on June 21, 2002, a day when the S&P 500 declined, and therefore, the defendant argues, Louros must have understood his investment position. The fact that he did not cancel Kreicas' power of attorney is said to show that he was hoping that the S&P 500 would rally and that he would realize gains.

Even assuming, as Kreicas apparently does, that failure to mitigate damages is an affirmative defense to a Section 10(b) claim – a point the Court does not now decide – Kreicas has failed to establish the absence of a genuine issue of fact as to this defense. At most, he has marshaled evidence from which a reasonable jury could conclude that Louros in fact understood his investment position at the relevant time periods.

In a similar vein, Kreicas argues that Louros ratified the transactions in his account because they were set out in the account statements and confirmations and he did not object to them. Again, assuming without deciding that ratification is an affirmative defense to a Section 10(b) claim, Kreicas at most has raised an issue of fact as to what Louros knew and when he knew it. The record does not indicate definitively that Louros received timely notification of the June Spreads or that he understood them. A jury might reasonably be able to conclude that Louros ratified the June Spreads (if the doctrine of ratification applies), but the Court cannot so hold on a motion for summary judgment.

C.     *Count Two: Common Law Fraud*

To recover for fraud in New York, "[t]here must be a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury."[150] A plaintiff must demonstrate that reliance on the information supplied was justifiable or reasonable.[151]

Kreicas argues that Louros cannot recover for fraud for the same reason that he cannot recover on his Section 10(b) claim, viz. that he cannot establish *scienter*, justifiable reliance, and causation. But the Court already has determined that there are genuine issues of fact as to those elements insofar as the Section 10(b) claim is based on Misrepresentations (3) and (5)(a).

The common law fraud claim fails insofar as it based on Misrepresentations (1), (2), (4), and (5)(b). The record does not support the allegation that Louros relied on Misrepresentation (1) in entering into the Second Arrangement. Even if the record could be so construed, such reliance would not have been justifiable or reasonable for someone in Louros' position.[152] Misrepresentation (2) was made prior to the First Arrangement and therefore also not the subject of any material reliance.[153] Reliance on Misrepresentations (4) and (5)(a) would not have been justifiable or

---

[150]

*Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803 (1969).

[151]

*E.g.*, *Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*, 2005 WL 729171, at *1 (1st Dep't March 31, 2005); *Goldman v. Strough Real Estate, Inc.*, 2 A.D.3d 677, 678, 770 N.Y.S.2d 94, 95 (2d Dep't 2003).

[152]

*See* footnote 143 above.

[153]

*See* sections B.1.c. and B.2.b. above.

reasonable because it is common knowledge that returns in the stock market cannot be obtained without risk.

### D.     Count Four: Breach of Contract

Kreicas argues that the contract claim is barred by the statute of frauds because the alleged contract was oral and by its terms not to be performed within one year from its making.[154] But the evidence does not indicate unambiguously, as Kreicas implies, that performance was to last at least one year. Although Louros' notes of the January 14, 2002 conversation that initiated the Second Arrangement say "I will not touch the stock accts until 1/14/03,"[155] he testified that the agreement was to leave the money with Kreicas for "*approximately* one year."[156] "Approximately one year" could be more than a year, or something less than that. Viewing the record in the light most favorable to the plaintiff, the Court cannot say as a matter of law that the contract claim is barred by the statute of frauds. The Court therefore does not reach Louros' arguments in response to the statute of frauds argument, nor does it consider the new arguments against the contract claim that Kreicas raises for the first time in his reply brief.[157]

---

[154]

See N.Y. GEN. OBLIG. LAW § 5-701(a)(1) (McKinney 2005).

[155]

Schoenberg Decl. Ex. 32.

[156]

Louros Dep. 152 (emphasis added).

[157]

See, e.g., *Scherer v. Equitable Life Assurance Society*, No. 01 Civ. 10193 (CSH), 2004 WL 2101932, at *5 n.1 (S.D.N.Y. Sept. 21, 2004); *Hughes v. JP Morgan Chase & Co.*, No. 01 Civ. 6087 (BSJ), 2004 WL 1403337, at *3 n.3 (S.D.N.Y. June 22, 2004); *Int'l Electronics, Inc. v. Media Syndication Global, Inc.*, No. 02 Civ. 4274 LAK, 2002 WL 1897661, at *3 n.2 (S.D.N.Y. Aug. 17, 2002).

E.      *Counts Three and Five: Breach of Fiduciary Duty and Negligence*

Kreicas argues that the breach of fiduciary duty and negligent misrepresentation claims are barred by the Martin Act,[158] New York's blue sky law, which authorizes only the New York Attorney General to enforce its provisions.

The New York Court of Appeals has held that there is no private right of action under the Martin Act,[159] and the vast majority of New York courts to consider the issue, as well as the Second Circuit, have extended that holding to preclude common law actions for breach of fiduciary duty and negligent misrepresentation where the alleged misdeeds fall within the purview of the Martin Act.[160] But that does not compel dismissal of the entirety of Counts Three and Five.

The Martin Act prohibits, as relevant here:

"(a)     Any fraud, deception, concealment, suppression, false pretense or fictitious

---

[158]

N.Y. GEN. BUS. LAW, Art. 23-A, §§ 352-59 (McKinney 2005).

[159]

*CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 807 (1987); *see also Vermeer Owners, Inc. v. Guterman*,78 N.Y.2d 1114, 1116, 578 N.Y.S.2d 128, 129 (1991).

[160]

*See, e.g.*, *Rego Park Gardens Owners, Inc. v. Rego Park Gardens Assocs.*, 191 A.D.2d 621, 622, 595 N.Y.S.2d 492, 494 (2d Dep't 1993); *Eagle Tenants Corp. v. Fishbein*, 182 A.D.2d 610, 611, 582 N.Y.S.2d 218, 219 (2d Dep't 1992); *Horn v. 440 East 57th Co.*, 151 A.D.2d 112, 119, 547 N.Y.S.2d 1, 5 (1st Dep't 1989); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001); *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 354-55 (S.D.N.Y. 2005); *Marcus v. Frome*, 329 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL 22052894, at *1-4 (S.D.N.Y. Sept. 2, 2003).

There is a minority view to the contrary. *See Scalp & Blade, Inc. v. Advest, Inc.*, 281 A.D.2d 882, 883, 722 N.Y.S.2d 639, 640 (4th Dep't 2001); *In re WorldCom, Inc.*, No. 02 Civ. 3288 (DLC), 2005 WL 701092, at *8 n.18 (S.D.N.Y. March 29, 2005); *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2498 (DLC), 2001 WL 1112548, at *3-4 (S.D.N.Y. Sept. 19, 2001).

or pretended purchase or sale;

"(b)      Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

"(c)      Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made"[161]

The New York Court of Appeals has explained that this statute "was enacted to protect the public from fraudulent exploitation in the offer and sale of securities, and its provisions are to be liberally construed to give full effect to its remedial purpose[.]"[162] The reach of the Act, however, cannot be unlimited. A claim of breach of duty that involves securities but does not allege any kind of dishonesty or deception implicates neither the plain language of the statute nor its policies. Such a claim therefore is not foreclosed by the absence of a private right of action under the Martin Act.[163]

Here Count Three simply alleges that Kreicas breached a fiduciary duty owed to Louros to manage his accounts in a way that comported with his needs and to keep him informed about the market and the trades in his account. This count does not allege deception, deliberate or otherwise.[164] Accordingly, Count Three does not come within the Martin Act, and it will not be

---

[161]

N.Y. GEN. BUS. LAW § 352-c(1) (McKinney 2005).

[162]

*Badem Bldgs. v. Abrams*, 70 N.Y.2d 45, 53-54, 517 N.Y.S.2d 450, 454-55 (1987); *accord People v. Lexington Sixty-First Assocs.*, 38 N.Y.2d 588, 595, 381 N.Y.S.2d 836, 840 (1976); *People v. Federated Radio Corp.*, 244 N.Y. 33, 38-39 (1926).

[163]

*Cf. Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004).

[164]

*See* Cpt. ¶¶ 95-96.

dismissed.

Count Five is more complicated because it is based on two separate sets of underlying facts: first, the same misrepresentations alleged in connection with the securities and common law fraud claims,[165] and second, the same failures to manage Louros' account properly and to keep him informed alleged in connection with Count Three. The first set deals with deception and therefore comes within the purview of the Martin Act. The second set, however, for the reasons just discussed does not come within the purview of the Martin Act and therefore Count Five is not barred insofar as it rests on that set.

### F. Sanctions

The defendant seeks sanctions pursuant to Rule 11 "in the event that this Court decides to dismiss the plaintiff's claims."[166] The request for sanctions will be denied both because much of the Complaint will not be dismissed and for the reasons stated by the Court in its earlier order.[167]

### Conclusion

The defendant's motion for summary judgment dismissing the complaint and for sanctions [docket item 40] is granted to the extent that the Complaint's First and Second Counts, insofar as they are based on Misrepresentations (1), (2), (4), (5)(b), Omission (6)(d), and the

---

[165] In this count, the misrepresentations allegedly were negligent.

[166] Def. Br. 29.

[167] See Louros v. Kreicas, 2003 WL 22353979, at *2 (S.D.N.Y. Oct. 15, 2003).

misrepresentation alleged in paragraphs 84(e) and 90(e) of the Complaint, and the Fifth Count, insofar as it is based on paragraphs 105 through 108 inclusive, are dismissed. The motion is otherwise denied.

Counsel shall appear for a final pretrial conference, prepared to discuss settlement, on May 11, 2005, at 4:30 P.M.

SO ORDERED.

Dated: April 25, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)